# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
———————————

UNITED STATES OF AMERICA,

      Plaintiff,

     v.                                  13 CR 3160 WJ

HUGO BUSTILLOS-DOMINGUEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER comes before the Court upon a Motion to Suppress Evidence filed by Defendant Bustillos-Dominguez on May 27, 2014 (**Doc. 39**).   Having reviewed the parties' briefs and applicable law, and following an evidentiary hearing on the matter, the Court finds that Defendant's motion is not well-taken and, therefore, is DENIED.

## BACKGROUND

This case concerns a cocaine trafficking ring that operated in Albuquerque in late summer/early fall of 2013.   Defendant seeks to suppress evidence seized from his apartment on September 4, 2013 as well as his statement made to the officers after the seizure.  A DEA special agent ("Agent Vega") testified at the hearing on behalf of the Government.    Agent Vega was involved in the surveillance of Defendants Bustillos-Dominguez ("Defendant" for purposes of this Order) and Ruandi Medina-Moncivais ("Moncivais") involving an undercover purchase of one kilogram of cocaine that was part of a larger investigation.  He became personally involved with the investigation in early August.  The members of this criminal conspiracy are alleged to be Defendants Bustillos-Dominguez, Moncivais and Jesus Orona-Cota ("Orona-Cota").

Defense counsel objected to Agent Vega's testimony in which the agent relied on reports of the investigation generated by other agents.  However, the Court overruled the objection on the basis of the collective knowledge doctrine.  *See, e.g., U.S. v. Chavez,* 534 F.3d 1338 (10th Cir. 2008) (stop and search of defendant's vehicle was justified where, based on DEA investigation, DEA task force officer directed patrolman to stop and search vehicle); *U.S.. v. Cervine,* 347 F.3d 865, 872 (10th Cir. 2003) (state troopers had reasonable suspicion based both on the representations by DEA agent that defendant was likely transporting illegal narcotics and on the facts supporting this assertion).

The testimony and evidence presented by the Government establishes the following, based on intercepted calls for which the Government had obtained a wiretap and on surveillance by DEA task force agents, which began in early August, 2013.   The information picked up from the following intercepted calls implicated all three Defendants in the drug deal:

August 23, 2013: call between Moncivais and Defendant: Moncivais would be picking up "seven" from Defendant's residence for a female called "Barbi."  Ten minutes, later Moncivais called Defendant to let him know he had almost arrived at Defendant's residence.

August 25, 2013: call between Moncivais and Defendant indicating that Moncivais would be going to Defendant's residence to obtain a quantity of cocaine for $650 to deliver to a male called "Benji"), that Benji would pay them and would receive "another half" [cocaine].

August 28, 2013 and September 3, 2013: several intercepted calls between Agent Terrazas acting undercover and Moncivais, and between Moncivais and Orona-Cota setting up the deal involving a "whole one" [purchase of one kilogram of cocaine] for  $30,000.

September 4, 2013: Terrazas called Moncivais and told him that he would be arriving in Albuquerque in an hour and 15 minutes and the two agreed to meet.

A DEA surveillance plane observed Moncivais leave his residence in a blue Chrysler Sebring which traveled to Defendant's residence.     Agents then saw Moncivais exit Defendant's residence to meet the driver of a black Mercedes that had pulled up to the residence.  Moncivais entered the front passenger side of the Mercedes and, a short time later, exited the car and went

back into Defendant's residence.  The black Mercedes drove off and the agent eventually lost surveillance of the car.   It was later determined that the driver of the car was Orona-Cota. Moncivais was then seen leaving Defendant's residence in a red Ford pickup truck, which was registered to an Abraham Bustillos, and which traveled to the Target store parking lot located near the intersection of Paseo del Norte and Interstate 25, where Moncivais met Agent Terrazas who was working undercover.   Moncivais was arrested when he delivered a kilogram of cocaine to the agent.

Simultaneously with Moncivais' arrest, other unidentified task force agents arrived to contact Defendant at his residence.  They did not have an arrest or search warrant.  The agents approached the front door of the residence and alerted their presence as "police."  The door was not shut tight, and drifted open.  Defendant was sitting in the living room with a three year old child.  Defendant was placed in "investigative detention" to conduct a security sweep of the residence.  Defendant continued to be detained while agents obtained a search warrant of the premises and an arrest warrant against Defendant.   A search of the residence pursuant to a search warrant revealed an 80.6 gross gram amount of marijuana found in the garage; a second 57.4 gross gram amount of marijuana in the kitchen refrigerator; a Smith and Wesson handgun in the backseat of the Chrysler Sebring that Moncivais had driven to Defendant's residence.

After being detained in his home for almost five hours while agents were procuring an arrest or search warrant, Defendant offered to cooperate with the agents by giving them information about the residence of Defendant Orona-Cota (who had also been referred to as "Chuy").   After being read his *Miranda* rights[1] and being taken into custody, Defendant showed the Agent Vera Orona-Cota's residence on the way to being taken to the DEA's Albuquerque

---

[1]   *See Miranda v. Arizona,* 384 U.S. 436 (1966).

District Office ("ADO").    After Defendant arrived at the ADO, he gave a statement which incriminated himself, Moncivais and Orona-Cota in the cocaine trafficking ring.

## DISCUSSION

Defendant contends that the agents lacked exigent circumstances to enter Defendant's residence and that the resulting confession was invalid, despite the subsequent arrest and search warrants that were procured.  The Government contends that the drug evidence was obtained pursuant to a lawful search warrant and that exigent circumstances justified the agents' warrantless entry into Defendant's home.

## I.    Legal Standard

It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. McCullough*, 457 F.3d 1150, 1163 (10th Cir. 2007).    The Fourth Amendment prohibits a warrantless arrest in the privacy of one's dwelling is "absent probable cause and exigent circumstances." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984).  Without exigent circumstances, the "Fourth Amendment has drawn a firm line at the entrance" to a dwelling and prohibits a law enforcement officer from crossing that threshold without a warrant.   *Payton v. New York*, 445 U.S. 573, 590 (1980). Since "searches and seizures inside a home without a warrant are presumptively unreasonable," *Payton*, 445 U.S. at 586, the government bears "a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh*, 466 U.S. at 749-50.

Although there "is no absolute test for determining whether exigent circumstances are present because such a determination ultimately depends on the unique facts of each controversy," the Tenth Circuit has "recognized certain general factors*." U.S. v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998).    There are "four requirements for a permissible warrantless

entry when the police fear the imminent destruction of evidence." *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996). Such an entry must be "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." Id. (quoting *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir.1988)). The ultimate determination of exigency depends on the unique facts of each particular case. *United States v. Parra*, 2 F.3d 1058, 1064 (10th Cir. 1993). Furthermore, a court will "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers." *Id*.

The "probable cause" justifying a warrantless search is identical with that required to justify issuance of a search warrant. *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986). A determination of probable cause is based on the totality of the circumstances. *United States v. Williams*, 45 F.3d 1481, 1485 (10th Cir. 1995) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The facts and circumstances must warrant a prudent man in believing that a criminal offense has been or will be committed. *Smith*, 797 U.S. at 840. More specifically, probable cause must be evaluated in relation to the circumstances as they would have appeared to a prudent, cautious and trained police officer. *Id*.

## II.      Legality of Warrantless Entry into Defendant's Residence

It is undisputed that agents entered Defendant's home without a warrant and without consent. The entry would be permitted under the Fourth Amendment only if exigent circumstances existed, where (1) the agents had probable cause; (2) the situation involved a serious crime and in circumstances where the destruction of evidence was likely; and (3) the entry was limited in scope. The burdens on the parties are somewhat evenly divided. The

Defendant has the burden of proving whether and when the Fourth Amendment is implicated. *U.S. v. Carhee*, 27 F.3d 1493, 1496 & n.1 (10th Cir. 1994); *U.S. v. Clarkson,* 551 F.3d 1196 (10th Cir. 2009) (proponent of motion to suppress evidence bears burden of proof).  However, the Government bears the burden of proving that its warrantless actions were justified.  *Carhee*, 27 F.3d at 1496 & n.1; *U.S. v. Parra*, 2 F.3d 1058 (10th Cir. 1993) (government's burden to prove exigent circumstances existed).

A.     <u>Probable Cause Existed</u>

Defendant argues that agents had no probable cause to suspect to believe that a crime had been or continued to be committed at Defendant's home and that the residence contained illegal narcotics.   The Court disagrees with this contention based on the following evidence:

- The agents obtained a warrant for a wiretap from United States District Judge James A. Parker, for which they were required to show probable cause before it was issued.

- The result of the wiretap establishes Defendant's participation in the cocaine trafficking conspiracy.   Defendant had discussions with Moncivais regarding pickups from his home to distribute quantities of cocaine to give to other resellers ("Barbi" and "Benji"). The sale of the kilogram of cocaine in this case was brokered through Defendant's home.[2]

- Defendant argues that Moncivais obtained the cocaine from Orona-Cota in a black Mercedes *outside* of Defendant's home, thereby eliminating any link to Defendant's home for the drug deals.  However, this contention ignores a common sense inference based on the facts.  Orona-Cota may have picked up the drugs from the driver of the black Mercedes outside of Defendant's residence, but he then returned to the *inside* of Defendant's residence.

- Moreover, based on the information possessed by the agents, there was probable cause to believe that Defendant's residence could have contained other non-drug paraphernalia that could also be subject to concealment or destruction had the agents not entered the home when they did.   Thus, based on the surveillance, intercepted phone calls, and the recently seized kilogram of cocaine, agents had probable cause to believe such items would be found there.

---

[2]   At the hearing, defense counsel raised the argument that the September 4th call did not implicate Defendant. However, the earlier intercepted calls in late August did, and those calls involved the same drug deal.   The fact that the September 4th call did not directly involve Defendant did not in any way attenuate any connection to Defendant based on the earlier calls.

Defendant argues that because there is no specific information about whether Moncivais actually brought drugs inside Defendant's home, and no way to know for sure whether anyone was in fact inside the house to possibly destroy evidence, the agents lacked probable cause to enter the residence without a warrant.  However, probable cause "is a matter of probabilities and common sense conclusions, not certainties."  *U.S. v. Biglow,* 562 F.3d 1272, 1280 (10th Cir. 2009).  There was certainly a sufficient basis for probable cause for the agents to believe that drugs would be found inside the home.

B.      Underlying Crime was Sufficiently Serious and Destruction of Evidence Was Likely

        *1.      "Serious Crime"*

Defendant contends that narcotics investigations are not "serious crimes" for purposes of exigent circumstances analysis, but this argument is unfounded.   Defendant relies on a single footnote in a Tenth Circuit case, *U.S. v. Aquino,* 836 F.2d 1268, 1271, n.4 (10th Cir. 1988), which in turn cites to *Welsh v. Winsconsin,* 466 U.S. 740, 749 (1984) for the proposition that distribution of controlled substances would not be considered a "serious crime" in order to permit a warrantless entry into a residence.

There are two flaws with Defendant's reliance on *Aquino.*  First, *Welsh* did not come to that conclusion at all, and *Aquino* did not cite to *Welsh* for that purpose.   *Welsh* held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made."  466 U.S. at 753.  *Aquino* referenced *Welsh* as having "cited cases allowing warrantless entry based on exigent circumstances in cases involving murder and armed robbery, but not in cases involving burglary without weapons and distribution of controlled substances."  *Id.* at 752.   One of the cases cited by *Welsh* involving the distribution of controlled substances was a South Dakota case, *State v. Bennett,* 295 N.W.2d 5

(S.D. 1980), which found that the warrantless search was not justified by exigent circumstances because of the delay in time that had elapsed between the date of the offense and the date of arrest.   Thus, the holding in the South Dakota case was limited to its facts.   Neither *Aquino* nor *Welsh* suggest a bright-line categorization for drug offenses in deciding whether they are "serious crimes" but rather take the approach the exigency analysis must be fact-specific.   *See United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996) (determination of presence of exigent circumstances "depends on the unique facts of each controversy") (quoting *Aquino,* 836 F.2d at 1259).    The end result is that Defendant's argument rests on a South Dakota case that was limited to its specific facts which are not similar to the facts in this case at all.

The second, and graver flaw with Defendant's reliance on *Aquino* is that *Aquino* is directly contrary to Defendant's position:

> **Our cases indicate that the sale of illegal drugs is a sufficiently severe offense to justify a warrantless entry when police "have reason to believe that criminal evidence" will be destroyed** if they do not immediately enter the premises . . . (citation omitted).   The question remains as to what facts meet this standard.

*Aquino,* 836 F.2d at 1273 (emphasis added); *see Scroger*, 98 F.3d at 1260 (". . . it is well established that drug manufacturing is a serious crime"); *U.S. v. Carr,* 939 F.2d 1442, 1448 (10th Cir. 1991) ("Drug trafficking crimes are serious. . . .").   His argument having received well-deserved criticism by the Government in its response, Defendant in his reply changes course and attempts to mischaracterize the substance of the Government's argument by characterizing the Government's position as rejecting any "serious offense" analysis for purposes of determining exigency.    This was never the Government's position.   The thrust of the Government's response mirrored the *Welsh* holding, which was that "the exigency analysis must be fact-specific. . . ."  Doc. 42 at 17.    In this case,

the facts indicate that the underlying crime was sufficiently serious to justify a warrantless entry because of the potential for destruction of the evidence that could have occurred in a relatively short period of time.

2.    *Destruction of Evidence Likely*

Defendant claims there was no risk of destruction because Moncivais was arrested and thus not around to warn Defendant, but this claim defies both logic and the facts. The agent testified at the hearing that entry into Defendant's home without a warrant was unplanned, and that they did not expect Moncivais to switch vehicles, using the red F-150 pick up truck parked at Defendant's residence instead of the Chrysler Sebring he had driven there.    The agents were concerned that the owner of the vehicle would become suspicious because Moncivais was not driving his own car at that point, given that the owner of the car was probably a relative of Defendant, given that the last name was identical and the fact that the car was parked at Defendant's home.  When the agents entered, the door was already cracked open and the officers conducted a protective sweep.

The Court agrees with the Government that Moncivais' failure to call Defendant to apprise him that the deal had taken place would naturally arouse Defendant's suspicions. Moncivais had just left Defendant's residence to make the deal with the undercover agent and, moreover, he was in a car that probably belonged to a member of Defendant's family.  It was therefore reasonable for a prudent and trained officer or agent to believe that Defendant would become suspicious that Moncivais failed to return.

Defendant makes several arguments against the potential for the destruction of evidence, but they are all easily rejected.  Defendant contends that the red F-150 truck had little value

because it was old, but the age of the truck has nothing to do with its significance:  Moncivais had taken a truck that held a probable connection to Defendant to a drug deal, and for that reason, could give Defendant reason to be worried if it did not return in the expected time frame. Defendant also claims that there was no indication that Defendant was inside the house becoming suspicious; there is no record of any calls being made by Moncivais to alert Defendant, nor did anyone see Defendant come out of the house looking like he was becoming suspicious.   These arguments fly in the face of common sense:  Moncivais wasn't making any phone calls because he was in custody, and Defendant could be getting worried inside his home as well as outside of it.  Moreover, at the point any calls were made to alert Defendant and at the point there was any fluster observable on the part of Defendant, it would have been too late for the agents to do anything to *prevent* the destruction of evidence.   As the Court previously mentioned, probable cause requires "probabilities and common sense conclusions, not certainties."   In this situation, the agents had good reason to believe that evidence which may have been inside of Defendant's home could probably be destroyed if they did not enter immediately.   It was also reasonable for a prudent and trained officer or agent to believe that Defendant would become suspicious Moncivais failed to return.  *See Scroger,* 98 F.3d at 1260 ("'[w]hen officers have reason to believe that criminal evidence may be destroyed or removed before a warrant can be obtained, the circumstances are considered sufficiently critical to permit' a warrantless entry.").

　　　*3.　　Minimal Intrusion*

　　　The Court finds that the agents' warrantless entry into Defendant's home was limited in scope to the minimal intrusion necessary to effectuate its purpose, which was the preservation of any potential evidence—and this Defendant does not contest.   Agents entered the home shortly

after 9:40 a.m., and secured the home until a search warrant and arrest warrant were obtained at 2

p.m.   This time period was fairly minimal in terms of the temporal scope of the intrusion.

Defendant was not unduly compromised in terms of comfort during that time: he was seated on

his living room couch, in his air conditioned home, where he was offered water and bathroom

trips multiple times.   The agents turned on cartoons on the television for the child, taking care

that the child was safe and not unduly alarmed.   The entry was therefore properly limited based

on the circumstances.

Accordingly, all of the requisite factors supporting a warrantless entry into Defendant's

home have been satisfied, and the Court thus finds that the entry was not illegal.

**III.**    **Legality of Confession**

Having found that the agents' warrantless entry into the residence was not illegal, the

seizure of marijuana in the home and Defendants' statements were both obtained subsequent to a

search warrant for the home and an arrest warrant.    Thus, there can be no connection between

the physical evidence seized or the confession, and a constitutional violation, on the ground that

no such violation was committed.

A.    <u>No Fourth Amendment Violation Even if Entry was Unconstitutional</u>

Even assuming that there were no exigent circumstances allowing the agents to enter

Defendant's residence, Defendant's statements were not made in violation of his Fourth

Amendment rights.

Defendant claims that the reading of his *Miranda* rights cannot purge the taint of the

Fourth Amendment violation based on the agents' illegal entry into his home and the subsequent

lengthy detention.   He also contends that his statements should be suppressed because they were

coerced and obtained as a result of the agents' illegal entry into his home, and that the

subsequent search and arrest warrant did not purge the confession of the "taint" arising from an illegal entry.   Defendant made two "statements" to the agents.   The first statement was Defendant's offer to show the agent "Chuy's" residence, although this can hardly be said to be incriminating.   The second statement was more of a confession in that it incriminated Defendant and his two co-Defendants in the cocaine trafficking ring.

As to the first statement, parties dispute whether the agent Defendant initiated the communication.   Agent Vega testified that he initiated communication toward the end of the almost five-hour detention, asking Defendant if he would like to offer any information. Defendant said he would, and the agent read him his *Miranda* rights.   Defendant contends that he volunteered to provide the agent information about where "Chuy" lived prior to leaving the residence, and then the agent read him his *Miranda* rights.   The matter of who started the communication amounts to a distinction without a difference.   In either scenario, Defendant did not offer any information (whether in response to the agent's offer or whether Defendant initiated the offer) until he had been advised of his rights.   Further, and most critically, Agent Vega had already been notified that an arrest warrant had been procured.   Thus, even if Defendant's first statement could lend itself to suppression as a statement that could be used against Defendant, and even if the agents entry had been without exigent circumstances, any taint of illegality had been attenuated by the procurement of an arrest warrant which virtually eliminates any connection to an alleged constitutional violation.

Defendant's challenge to the second statement, the confession made at the ADO, is subject to the same analysis.   In a situation where the agents did not have exigent circumstances to enter Defendant's home without a warrant, the Court must look at whether there is a connection between the Fourth Amendment violation and the statement or confession.

However, the Court finds none because there were sufficient intervening circumstances to vitiate or purge any "taint" that may have been the result of the illegal entry.   On this issue, *New York v. Harris,* 495 U.S. 14 (1990) is a case that is both instructive and relevant and was cited by both parties, but for different reasons.

Defendant relies on *Harris* to show that reading *Miranda* rights to an individual does not purge any post-arrest statement that was made after a Fourth Amendment violation, as in an unlawful entry.   The Government relies on *Harris* to demonstrate that the facts do not line up exactly the way they did in *Harris*.   The facts in that case are worth reviewing.   In *Harris,* police officers went to Harris' apartment to take him into custody because he was the primary suspect in a murder.   However, they did not obtain an arrest warrant prior to doing so.   Harris let the officers in the apartment after they displayed their guns and badges, so the entry was not consensual.   The officers read Harris his *Miranda* rights, and Harris acknowledged that he understood those rights and was willing to answer the officers' questions.   Harris admitted committing the murder.   After this first confession, Harris was taken into custody and brought to the police station where he was read his *Miranda* rights again and signed a written inculpatory statement.   He was read his rights a third time after which police videotaped an incriminating interview between himself and a district attorney even though Harris had indicated that he no longer wished to be questioned.

The trial court suppressed the first statement (made after the officers' entry into the home without an arrest warrant) but admitted the second statement, and Harris was convicted of second degree murder.   The decision was affirmed on appeal, but the case eventually ended up in the United States Supreme Court, which decided that the second statement, given at the station house

after receiving a *Miranda* warning, was admissible.[3]   The Supreme Court reasoned that Harris'
statement at the police station was not the product of being in unlawful custody, nor was it "the
fruit of having been arrested in the home rather than somewhere else."   In other words, the first
confession was suppressed because the constitutional violation that occurred when the officers
entered Harris' home without a warrant or consent was not sufficiently attenuated by reading
Harris his *Miranda* rights for the first time.   However, as to the second confession, the Supreme
Court concluded that there was a sufficient length of time and intervening circumstances
between that Fourth Amendment violation to render the second statement, made after Harris was
read his *Miranda* rights for the second time, as valid and admissible.   *Harris,* 495 U.S. at 23
(citing *Brown v. Illinois,* 422 U.S. 590, 601-02 (1975)).

        Defendant analogizes his situation to that in *Harris* because the alleged illegal entry
sufficiently tainted any of the statements he subsequently.   He contends that there were
insufficient intervening circumstances between the initial illegal entry and his confession at the
ADO to purge any taint of illegality, notwithstanding his removal from his residence since his
confession related to the initial "interrogation." Doc. 43 at 6.   Defendant's argument fails for
two reasons.   First, Defendant seems to forget that in *Harris,* (and as the Government noted at
the hearing), Harris' confession was not made subsequent to an arrest warrant being obtained, as
occurred here.   Second, in *Harris,* even though no arrest warrant had been obtained, and even
though the initial confession was suppressed, the second confession Harris made later while in
custody *was* admitted and was not suppressed.   The Supreme Court's reasoning was based not
only on relevant Fourth Amendment case law, but on a common sense understanding of the
purpose behind Fourth Amendment protections:

---

[33]   The third statement was suppressed, obviously, because Harris had withdrawn his waiver of rights at the point he
declined to answer any more questions.

> Where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*. The penalties imposed on the government where its officers have violated the law must bear some relation to the purposes which the law serves. . . **The rule in *Payton* was designed to protect the physical integrity of the home, not to grant criminal suspects protection for statements made outside their premises where the police have probable cause to make an arrest.**

*New York v. Harris*, 495 U.S. 14 (1990) (emphasis added) (citing *Payton v. New York,* 445 U.S. 573, 603 (1980) (for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within).   Here, Defendant's confession did not spring from the agents' earlier entry into the house; rather, it was the product of being transported to the ADO, after being formally arrested pursuant to a search warrant.   Accordingly, neither of Defendant's two statements was tainted by an illegal entry, even if the Court assumes that the DEA task force agents violated Defendant's Fourth Amendment rights by entering his residence without a warrant, and neither of the statements shall be suppressed.

B.     Statements Were Not Coerced

Defendant next contends that even apart from any connection to an illegal entry, his statements should be suppressed because they were not voluntary and were the product of coercion.   The circumstances of his detention are undisputed.  Defendant was handcuffed with his hands in front of him,[4] was allowed to sit on his couch in his air-conditioned living room where he watched cartoons that the agents had turned on for Defendant's daughter.   Defendant was allowed to use the bathroom on request, and was given water frequently.   The detention

---

[4] Agent Vega testified that because Defendant was not under formal arrest at that time, the agents handcuffed him with his hands in front, which is a more comfortable position.

began about 9:40 in the morning, and ended around 2:00 when the warrants were obtained from a United States Magistrate Judge.

Despite being detained in relative comfort during this time, Defendant claims that his inclination to make his first statement to Agent Vega was coerced because the agents made comments about his home being a "pretty" or "nice" home, suggesting (according to Defendant) that he was being taunted about being unable to enjoy that home if he did not cooperate with the agents.   As the Government noted, if a compliment about someone's residence could be characterized as coercive, then no statement would be free of that label.   Defendant also claims that his statements were coerced because of the length of time he was detained and which turned the detention into a full-blown arrest.   This argument has no support in the relevant case law. Courts have never provided a bright-line to distinguish between detention and arrest.  *See U.S. v. White,* 584 F.3d 935, 952-52 (10th Cir. 2009) (citing *U.S. v. Sharpe,* 470 U.S. 675, 685 (1985) (eschewing bright-line rule).   While an investigative detention may last too long under the specific circumstances of a given case and on that basis may be transformed into a de facto arrest, *White,* 584 F.3d at 953, the instant case is not such a case.   A span of five hours is a reasonably expedient length of time in for agents to secure the residence, generate affidavits and seek out a federal magistrate judge to issue warrants in a situation where the individual being detained is a criminal suspect.  *Cmp. Manazanares v. Higdon,* 575 F.3d 1135, 1148-1149 (10th Cir. 2009) (in civil rights case, holding a witness who was never suspected of any criminal conduct in back of squad car for more than three hours was sufficient to turn detention into formal arrest).

The Supreme Court case, *Segura v. U.S.,* 468 U.S. 796 (1984) is a case with almost identical facts to this case, and involved a detention of defendant of nineteen hours.   The agents

in that case, as in the case now before the Court, feared that defendant might destroy evidence which agents suspected was inside the residence, and detained defendant while a search warrant was being obtained.  The Supreme Court found that those circumstances, including the nineteen hour detention, did not violate the Fourth Amendment's proscription against unreasonable seizures.

Defendant does not specifically raise any argument objecting to the protective sweep that was conducted when the agents first entered the residence, but the Court notes that the agents had the added concern of the safety and security of the three-year old child who was in the house at the time.  The Court might add that if a driver charged with a DWI offense could face a potential charge of negligent child abuse, it is not a stretch for DEA task force agents doing a protective sweep of a sweep of a building that may have drugs being manufactured and/or stored inside to be concerned about child endangerment.  See, e.g., State v. Orquiz, 284 P.3d 418 (N.M.App. 2012) (defendant's conduct of driving a moving vehicle with his child as a passenger while intoxicated was sufficient to support conviction for child abuse by endangerment); 1978 NMSA §§66-1-4.4(K), 66-8-102(A).

Defendant contends that he did not actually waive his *Miranda* rights despite his express consent to do so, suggesting that his waiver must be judged by a standard other than the traditional test for determining the voluntariness of a person's response or consent.  Defendant relies on *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973) for this concept, but the Court cannot find such an idea anywhere in the case.  In fact in *Bustamonte,* the United States Supreme Court confirmed the use of the traditional test in determining the voluntariness of consent, finding that "there is, therefore, no reason to reject the traditional test for determining the voluntariness of a person's response." 412 U.S. at 247.   The court expressly rejected the argument that in order for

consent to be voluntary, there must be a showing that consent had been given with an understanding that it could be freely and effectively withheld.  Instead, the court acknowledged that "[w]hile knowledge of a right to refuse consent is a factor to be taken into account, the State need not prove that the one giving permission to search knew that he had a right to withhold his consent."  *Id.* at 249.   Thus, *Bustamonte,* contrary to Defendant's argument, embraces and keeps intact the traditional test for consent in determining voluntary wavier of an individual's *Miranda* rights:

> We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. **Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required**.

*Bustamonte,* 412 U.S. at 248-249 (emphasis added).  Here, Defendant was read his *Miranda* rights in his home prior to making any statement to the agents, he was kept in relative comfort of his air-conditioned home with his three year-old child watching cartoons for the entirety of the detention, and there was no coercion (either physical, mental or emotional) of any kind during this period.[5]  The Court finds that Defendant's waiver and consent to communicate with the agents was knowing and voluntary, and the confession will not be suppressed on that basis.

Defendant's final attempt to chip away at the legal validity of his confession is his contention that he was never actually given a *Miranda* warning at the ADO, but instead was asked if it was necessary to read it to him again—which he declined.   Defendant does not dispute that he was in fact read his *Miranda* rights earlier in his home, but nevertheless stands on ceremony that the second *Miranda* "reminder" at the ADO does not count because it was not

---

[5]   At the hearing, the Government noted that at the beginning of the detention, Defendant appeared to be crying, but considering the situation unfolding, this was a normal human response to the circumstances rather than the result of any coercive tactics on the part of the Government agents.

actually read to him a second time.   Defendant relies on *U.S. v. Espinosa-Orlando,* 704 F.2d 507, 514 (11th Cir. 1983) for support, but the defendant in that case had never been given his *Miranda* rights at all, and so was never advised of the four elements that constitute a *Miranda* warning.   Defendant in this case had, of course, been read his *Miranda* rights in full earlier at his home.   Defendant does not provide any case law on point that says he is entitled to a second full reading within the time period and underlying facts of this case.

At the hearing, defense counsel posited yet another reason why his consent was infirm, and that was because the agent reading him his rights did not advise him that he also had the right to end any conversations with the agent.   As far as the Court is aware, *Miranda* requires only the following four elements to be read to a defendant: the right to remain silent, the right to be told that anything he says may be used against him, his right to have counsel present during questioning and the right to have counsel appointed if he could not afford one.   *Espinosa-Orlando*, 704 F.2d at 514 (citing *Miranda*, 384 U.S. at 479).   Thus, the agents did not violate Defendant's Fourth Amendment rights because he was not advised that he could end his conversation with the agent at any time.   What makes counsel's argument on this issue particularly specious—as well as moot—is that one of the agents actually did advise Defendant that he had the right to stop the conversation at any time.

## IV.    Seizure of Physical Evidence

In his briefs, Defendant challenged the seizure of both the handgun that was found in the Chrysler Sebring and the marijuana found in his home.   At the hearing, Defendant advised the

Court that he waived any challenge to the car search, and appeared to abandon his challenge to the seizure of the marijuana.[6]

In light of the foregoing discussion, there is not much left to discuss regarding the legality of the seizure of the marijuana.   Evidence cannot be suppressed as fruit of the poisonous tree unless an unlawful search is, at the very least, the "but-for" cause of its discovery.   *United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) (citing *Hudson v. Michigan*, 547 U.S. 586 (2006)).   "Even then, causation is often so attenuated that suppression is not justified."   *Id*.   The Tenth Circuit has described this **"but-for"** relationship as a "factual nexus between the illegality and the challenged evidence." *Id*. (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)).   "To establish the factual nexus, at a minimum, 'a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'"   *Id*. (quoting *Nava-Ramirez*, 210 F.3d at 1131); *United States v. Torres–Castro*, 470 F.3d 992, 999 (10th Cir. 2006) (same).

Defendant claims that the subsequent search and arrest warrant did not purge the seizure of the evidence from the "taint" arising from an illegal entry, and the items were recovered as a result of the violation of his Fourth Amendment rights.   The Court disagrees with this conclusion because the Court has found the entry to be legal based on exigent circumstances.   Moreover, even if the warrantless entry was unlawful, Defendant cannot make the requisite showing that the constitutional violation was the "but-for" cause of the discovery of the evidence seized at his home.   The drugs were seized only after a search warrant had been procured.   Except for the protective sweep that was carried out after the initial entry, agents did not search Defendant's

---

[6]   In his briefs, Defendant contended that since he was not charged with marijuana possession, the legality of the search leading to its discovery is moot.  However, the Government noted that marijuana possession may be used at trial for impeachment purposes.

home until a search warrant was issued.  A valid search warrant was issued independent of any facts obtained from the allegedly initial, warrantless entry, and no search was conducted until after the warrant was obtained.  Therefore, the marijuana that was found subject to the search warrant was not found as a result of an illegal entry.  *See U.S. v. Rey,* 663 F.Supp.2d 1086 (D.N.M. 2009) (Under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree); *U.S. v. Forbes,* 528 F.3d 1273, 1280 (10th Cir. 2008) (earlier unconstitutional search must be the cause of later discovered evidence in order to justify suppression).  Because Defendant presents no real argument as to how the allegedly illegal entry gave rise (was the "but-for") to the discovery of any of the evidence seized from the home, agents lawfully seized the evidence pursuant to the search warrant, and the evidence will not be suppressed.  *Cmp. Segura v. U.S.,* 468 U.S. 796 (1984) (valid search warrant obtained subsequent to illegal entry into apartment found to be "sufficiently distinguishable" to purge any "taint" arising from illegal entry, and evidence subsequently discovered during search conducted under a valid warrant was " wholly unrelated to the prior entry" and did not need to be suppressed).

### CONCLUSION

In sum, the Court finds and concludes that all of the requisite factors supporting a warrantless entry into Defendant's home have been satisfied, and that the agents' warrantless entry into Defendant's home was not illegal.   The subsequent seizure of the physical evidence (the marijuana) was not a result of any constitutional violation, and therefore this evidence will not be suppressed.  For the same reason, the Court finds and concludes that Defendant's two statements were not made in violation of his Fourth Amendment rights.

In sum, the Court also finds and concludes that even if the agents' entry into Defendant's home was unlawful, neither his statements nor the physical evidence will be suppressed. Defendant cannot make the requisite showing that the constitutional violation was the "but-for" cause of the discovery of the evidence seized at his home, nor can he show that he statements were tainted by an illegal entry.  He was advised of his legal rights under *Miranda,* and his consent was voluntary and not coerced in any way.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence (**Doc. 39**) is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE